Slip Op. 19-76

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN ALLIANCE FOR HARDWOOD PLYWOOD ET AL., | |
|       Plaintiffs and Consolidated Plaintiffs, | |
| v. | Before: Claire R. Kelly, Judge |
| UNITED STATES and UNITED STATES INTERNATIONAL TRADE COMMISSION, | Consol. Court No. 18-00013 PUBLIC VERSION |
|       Defendants, | |
| and | |
| COALITION FOR FAIR TRADE OF HARDWOOD PLYWOOD, | |
|       Defendant-Intervenor and Consolidated Defendant-Intervenor. | |

## OPINION AND ORDER

[Sustaining the U.S. International Trade Commission's final affirmative injury determination in its antidumping and countervailing duty investigations of hardwood plywood from the People's Republic of China.]

Dated: June 19, 2019

Jeffrey Sheldon Grimson and James Corscaden Beaty, Mowry & Grimson, PLLC, of Washington D.C., argued for plaintiffs American Alliance for Hardwood Plywood, Far East American, Inc., Northwest Hardwoods, Inc., Concannon Lumber and Plywood (Concannon Corp. d/b/a Concannon Lumber Company), American Pacific Plywood, Inc., Canusa Wood Products Ltd., Fabuwood Cabinetry Corp., Hardwoods Specialty Products USLP, Holland Southwest International Inc., Liberty Woods International, Inc., McCorry & Co. Ltd., MJB Wood Group, Inc., Patriot Timber Products, Inc., Richmond International Forest Products, LLC, Taraca Pacific, Inc., USPly Trading Co. (USPly LLC) and Wood Brokerage International d/b/a Red Tide International, LLC.  With them on the brief were Jill A. Cramer and Yuzhe PengLing.

<u>Stephen William Brophy</u>, Husch Blackwell LLP, of Washington D.C., argued for consolidated plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd. et al.  With him on the brief was <u>Jeffrey S. Neeley</u>.

<u>Karl Stuart von Schriltz</u>, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, and <u>Andrea C. Casson</u>, Assistant General Counsel for Litigation, argued for defendant.  With them on the brief was <u>Dominic L. Bianchi</u>, General Counsel.

<u>Timothy C. Brightbill</u>, Wiley Rein, LLP, of Washington D.C., argued for defendant-intervenor, the Coalition for Fair Trade of Hardwood Plywood.  With him on the brief was <u>Stephanie Manaker Bell</u>.

Kelly, Judge: Before the court are several motions for judgment on the agency record challenging various aspects of the U.S. International Trade Commission's ("ITC" or "Commission") final affirmative injury determination in its antidumping and countervailing duty ("ADD" and "CVD") investigations of hardwood plywood ("HWPW") from the People's Republic of China ("PRC").  See <u>[HWPW] from China</u>, 82 Fed. Reg. 61,325 (Int'l Trade Comm'n Dec. 27, 2017); Mem. P. & A. Supp. Rule 56.2 Mot. J. Agency R. of American Alliance for Hardwood Plywood et al., Sept. 17, 2018, ECF No. 61 ("AAHP's Br."); Mem. Supp. Rule 56.2 Mot. J. Agency R. of Consol. Pls. Zhejiang Dehua TB Import & Export Co., Ltd. et al., Sept. 17, 2018, ECF No. 58 ("Zhejiang's Br.").

For the reasons that follow, the court sustains the ITC's final affirmative injury determination.

## BACKGROUND

The ADD and CVD investigations at issue covered the period of January 1, 2014, to June 30, 2017, and involved imports of HWPW from the PRC.  See Final Consol. Staff

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 3 of 30

Consol. Court No. 18-00013                                              Page 3
PUBLIC VERSION

Report and Views at 4, Dec. 21, 2017, ECF No. 47-1.[1]  HWPW is a wood panel product made from gluing two or more layers of wood veneer to a core.[2] See Views at 10.  The core itself may be composed of veneers or other types of wood material.  See id.  HWPW products are differentiated by species, quality of veneer, overall thickness, number of plies, type of core, and type of adhesive used.  See id.

On November 18, 2016, the Coalition for Fair Trade of Hardwood Plywood (the "Coalition"),[3] filed an ADD and CVD petition with the U.S. Department of Commerce ("Commerce") and the ITC.  See Petition for the Imposition of Antidumping & Countervailing Duties, Inv. Nos. 701-TA-565 and 731–TA–1341, CD 1 (Nov. 18, 2016) ("Petition").  Commerce and the ITC initiated ADD and CVD investigations into imports of HWPW from the PRC in response to this petition.  See [HWPW] From China, 81 Fed. Reg. 85,639 (Int'l Trade Comm'n Nov. 28, 2016) (institution of ADD and CVD investigations, and scheduling of prelim. phase investigations); Certain [HWPW] Products From the [PRC], 81 Fed. Reg. 91,125 (Dep't Commerce Dec. 16, 2016) (initiation of less-than-fair-value investigation); Certain [HWPW] Products From the [PRC], 81 Fed. Reg. 91,131 (Dep't Commerce Dec. 16, 2016) (initiation of CVD investigation).

In its preliminary determinations, Commerce found that HWPW from the PRC was being sold at less than fair value and the PRC-industry was receiving countervailable

---

[1] The court cites to the confidential Final Consolidated Staff Report and Views, which is divided into two sections: the Views of the Commission and the Staff Report, referred to, respectively, as Views and Staff Report.

[2] A veneer is a slice of wood which is cut, sliced or sawed from a log, bolt, or flitch.  See Views at 6.  The core of HWPW is the layer or layers of material situated between the face and back veneers.  See id. at 7.

[3] The Coalition consists of Columbia Forest Products, Commonwealth Plywood, Inc., Murphy Company, Roseburg Forest Products Co., States Industries, Inc., and Timber Products Company, all of which are domestic producers of hardwood plywood.  Petition at 1.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 4 of 30

Consol. Court No. 18-00013                                              Page 4
**PUBLIC VERSION**

subsidies.  See Certain [HWPW] Products from the [PRC], 82 Fed. Reg. 28,629 (Dep't

Commerce June 23, 2017) (prelim. affirmative determination of sales at less than fair

value, prelim. affirmative determination of critical circumstances, in part); Certain [HWPW]

Products from the [PRC], 82 Fed. Reg. 19,022 (Dep't Commerce Apr. 25, 2017) (prelim.

affirmative CVD determination, prelim. affirmative critical circumstances determination, in

part, and alignment of final determination with final ADD determination).    Commerce

sustained these findings in its final determinations.  See Certain [HWPW] Products From

the [PRC], 82 Fed. Reg. 53,460, 53,470 (Dep't Commerce Nov. 16, 2017) (final

determination of sales at less than fair value, and final affirmative determination of critical

circumstances, in part); [CVD] Investigation of Certain [HWPW] Products From the [PRC],

82 Fed. Reg. 53,473, 53,476 (Dep't Commerce Nov. 16, 2017) (final affirmative

determination, and final affirmative critical circumstances determination, in part); see also

Certain [HWPW] Products From the [PRC], 82 Fed. Red. 32,683 (Dep't Commerce July

17, 2017) (amending ministerial errors in prelim. determination of sales at less than fair

value).

Concurrent with Commerce's proceedings, the ITC investigated whether domestic

industry was materially injured or threatened with material injury by reason of imports of

the subject merchandise.  See [HWPW] From China, 81 Fed. Reg. 85,639 (Int'l Trade

Comm'n Nov. 28, 2016).  The ITC received questionnaire responses from nine domestic

producers which accounted for nearly all domestic production of HWPW in 2016.  Views

at 4.  Import data was based on questionnaire responses of 74 U.S. importers of HWPW

from the PRC, which accounted for 94% of subject imports from the PRC in 2016.  Id.

The ITC defined the domestic like product to be a single product co-extensive with the

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 5 of 30

Consol. Court No. 18-00013                                                      Page 5
PUBLIC VERSION

scope Commerce's investigations.  See id. at 11–12; see also Hardwood Plywood from China at 9, USITC Pub. 4661, Inv. Nos. 701-TA-565 and 731-TA-1341 (Prelim.), (Jan. 2017).  No domestic producers of the domestic like product were excluded from the domestic industry.  See Views at 12.  The ITC issued a preliminary determination finding that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of HWPW from the PRC.  See [HWPW] Products from China, 82 Fed. Reg. 2,393 (Int'l Trade Comm'n Jan. 9, 2017).  Prior to making its final material injury determination, the ITC held a public hearing on October 26, 2017, and the interested parties submitted pre- and post- hearing briefs.

In its final determination, the ITC concluded that an industry in the United States is materially injured by reason of imports of HWPW from the PRC that Commerce had found to be subsidized and sold in the United States at less than fair value.  See Hardwood Plywood from China, 82 Fed. Reg. 61,325 (Int'l Trade Comm'n Dec. 27, 2017).  ADD and CVD duty orders were then issued by Commerce.  See Certain [HWPW] Products From the [PRC], 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) (amended final determination of sales at less than fair value and ADD order); Certain [HWPW] Products From the [PRC], 83 Fed. Reg. 513 (Dep't Commerce Jan. 4, 2018) (CVD order).

Plaintiffs American Alliance for Hardwood Plywood et al. (collectively "AAHP"),[4] filed a complaint on March 2, 2018.  See AAHP's Compl., Mar. 2, 2018, ECF No. 10.

---

[4] Plaintiffs, collectively defined as AAHP, include: American Alliance for Hardwood Plywood, Far East American, Inc., Northwest Hardwoods, Inc., American Pacific Plywood, Inc., Canusa Wood Products Ltd., Concannon Lumber and Plywood (Concannon Corp. d/b/a Concannon Lumber Company), Fabuwood Cabinetry Corporation, Hardwoods Specialty Products USLP, Holland Southwest International Inc., Liberty Woods International, Inc., McCorry & Co. Ltd., MJB Wood

(footnote continued)

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 6 of 30

Consol. Court No. 18-00013                                                          Page 6
**PUBLIC VERSION**

Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd. et al. ("Zhejiang"),[5]

separately filed a complaint on the same day.  See Zhejiang's Compl., Mar. 2, 2018, ECF

No. 8, Zhejiang Dehua TB Import & Export Co., Ltd. et al v. United States, Ct. No. 18-

00021 (USCIT filed Feb. 2, 2018).   The proceedings initiated by Zhejiang were later

consolidated into the present action.  See Order, May 10, 2018, ECF No. 52.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012)[6] and 28 U.S.C. § 1581(c) (2012),

which grant the court authority to review actions contesting a final affirmative injury

determination.  "The court shall hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

AAHP and Zhejiang together challenge five aspects of the ITC's final affirmative

injury determination.   First, they challenge the ITC's conditions of competition analysis,

arguing the ITC's finding that subject imports are moderately substitutable with domestic

like product is unsupported by substantial evidence.  See AAHP's Br. at 1–2, 4–19;

---

Group, Inc., Patriot Timber Products, Inc., Richmond International Forest Products, LLC, Taraca Pacific, Inc., USPly Trading Co. (USPly LLC), and Wood Brokerage International d/b/a Red Tide International, LLC.  See AAHP's Summons, Feb. 2, 2018, ECF No. 1.  Plaintiff Plywood Source LLC, although appearing on all briefing filed before this court, was dismissed from the present action for failure to retain substitute counsel, as required by this Court's Rule 75(b)(1).  Order, Apr. 8, 2019, ECF No. 121.

[5] There are 84 consolidated plaintiffs in this consolidated action.  See Summons at Attach., Feb. 2, 2018, ECF No. 1, Zhejiang Dehua TB Import & Export Co., Ltd. v. United States, Ct. No. 18-00021 (USCIT filed Feb. 2, 2018) (providing all, in list form).

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 7 of 30

Consol. Court No. 18-00013                                                        Page 7
PUBLIC VERSION

Zhejiang's Br. at 1–2, 10–16.  Second, they argue the ITC's finding that the volume of subject imports was significant is unsupported by substantial evidence and is not in accordance with law.  See AAHP's Br. at 2, 19–25; Zhejiang's Br. at 1–2, 16–18.  Third, they argue the ITC's finding that subject imports undersold domestic like product during the period of investigation, and resulted in price suppression, is unsupported by substantial evidence and is not in accordance with law.  See AAHP's Br. at 2, 25–37; Zhejiang's Br. at 2, 18–23.  Fourth, they argue the ITC's finding that subject imports significantly impacted the domestic industry is unsupported by substantial evidence.  See AAHP's Br. at 2, 37–39, Zhejiang's Br. at 2, 23.  Finally, they argue the ITC's conclusion that non-subject imports could not account for the price effects and impact on the domestic industry identified in its analysis was unsupported by substantial evidence and arbitrary and capricious.  See AAHP's Br. at 2, 39–44; Zhejiang's Br. at 2, 23–26.[7]  For the reasons that follow, the court finds the ITC's final affirmative injury determination is supported by substantial evidence and in accordance with law, and not arbitrary or capricious.

### I.  Legal Framework

In ADD and CVD proceedings, respectively, Commerce determines whether subject merchandise was sold at less than fair value in the United States or benefited from countervailable subsidies.  See 19 U.S.C. §§ 1671(a), 1673.  At the same time, the ITC conducts an investigation to determine whether imports of subject merchandise have materially injured or threaten to materially injure a domestic industry, or retard the establishment of a domestic industry.  See id.  Commerce will issue the relevant

---

[7] AAHP also adopts and incorporates by reference Zhejiang's arguments.  See AAHP's Br. at 44.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 8 of 30

Consol. Court No. 18-00013                                                    Page 8
**PUBLIC VERSION**

antidumping and countervailing duty orders if both investigations lead to affirmative findings.  See id. §§ 1671d(c)(2), 1673d(c)(2).

The ITC will make an affirmative material injury determination when it finds (1) material injury that is (2) by reason of the subject imports.  See Swiff–Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015).  Material injury is a harm which is not inconsequential, immaterial, or unimportant.  See 19 U.S.C. § 1677(7)(A).  To determine whether a domestic industry is materially injured, the ITC considers:

> (I)     the volume of imports of the subject merchandise,
>
> (II)    the effect of imports of that merchandise on prices in the United States for domestic like products, and
>
> (III)   the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States.

Id. § 1677(7)(B)(i).  The ITC may also "consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports."  See id. § 1677(7)(B)(ii).  No single factor is dispositive, and the ITC evaluates "all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).

## II. Substitutability

AAHP and Zhejiang argue that the ITC's finding that subject imports and domestic like product are moderately substitutable is unsupported by substantial evidence.  See AAHP's Br. at 4–19; Zhejiang's Br. at 10–16.  Defendant responds that the ITC's determination is supported by substantial evidence.  See Def. [ITC's] Mem. Opp'n Pls.' Mots. J. Agency R. at 9–25, Dec. 19, 2018, ECF No. 94 ("Def.'s Resp. Br.").  For the

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 9 of 30

Consol. Court No. 18-00013                                                    Page 9
PUBLIC VERSION

reasons that follow, the ITC's finding of moderate substitutability is supported by substantial evidence.

Substitutability refers to the ease with which different products can be substituted for one another and is an economic factor that may be relevant to the conditions of competition.  See R–M Indus., Inc. v. United States, 18 CIT 219, 226 n.9, 848 F. Supp. 204, 210 n.9 (1994); see also General Motors Corp. v. United States, 17 CIT 697, 706, 827 F. Supp. 774, 784 (1993).  The ITC's findings regarding competition and market conditions must be supported by substantial evidence.  See 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951).  The possibility of drawing two inconsistent conclusions from the evidence does not prevent the court from holding that the ITC's findings are supported by substantial evidence.  See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

In this case, the ITC found that subject imports and the domestic like product were "moderately substitutable."  Views at 24.  The ITC reached this conclusion through an analysis of several aspects of the HWPW market; in particular market share, product characteristics and questionnaire responses by market participants.  See id. at 21–28.

As to market share, the ITC identified a substantial overlap between subject imports and domestic like product for cabinetry with exposed uses.  See Views at 26. Specifically, the ITC also found that cabinetry with exposed uses was the "dominant application for the domestic product and a substantial application for subject imports."

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 10 of 30

Consol. Court No. 18-00013                                                    Page 10
PUBLIC VERSION

Id.[8]  The ITC found there was "some overlap" with respect to the finish used in exposed

cabinetry applications, with subject imports and domestic like product both being sanded

and stained, as well as painted.  Id.[9]

The ITC then considered product characteristics and found subject imports and

the domestic like product "overlap with respect to numerous product characteristics,"

including overall thickness, face species, grade and core composition.  Views at 25.

AAHP and Zhejiang argue that the relevant United States Hardwood Plywood Veneer

Association ("HPVA") grading system is not a suitable point of comparison because

subject imports do not consistently conform to HPVA grades.  See Zhejiang's Br. at 11–

12; AAHP's Br. at 7.[10]  Although the ITC recognized that not all subject imports conformed

to the HPVA standard, Views at 11 n.18, reliance on this standard was reasonable

because market participants had been directed to report grade either on the basis of the

HPVA standard or "substantially equivalent grade."  See, e.g., Blank U.S. Importers'

Questionnaire at 17, PD 114 (July 6, 2017).  Here, the responding U.S. importers

---

[8] In 2016, 50.8% of domestic like product was used for cabinetry end-uses and of that portion that was used for cabinetry end-uses [[        ]]% of such product was used for exterior cabinetry applications.  See Staff Report at Table II-3 & Table III-12.  With respect to subject imports, in 2016, 21.2% were shipped for cabinetry end-uses, and of that portion that was used for cabinetry end-use [[        ]]% used for exterior cabinetry applications.  See id. at Table II-3 & Table IV-12.

[9] This data showed that [[        ]]% of domestic like product and [[        ]]% of subject imports used in exposed cabinet applications were sanded and stained, while [[        ]]% of domestic like product and [[        ]]% of subject imports were painted.  See Staff Report at Table II-4.

[10] AAHP also asserts the ITC failed to consider the impact of differences in core species between domestic like product and subject imports.  See AAHP's Br. at 8.  However, the ITC identified that subject imports predominantly use cores composed of hardwood while [[                    ]] of domestic like product use a hardwood core.  See Views at 25.  The ITC's explanations do not have to be perfect where the path of the agency decision is reasonably discernable.  NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009).  As the ITC found there was significant overlap in core composition between subject merchandise and domestic like product, it is reasonably discernible that the ITC concluded core species would not significantly limit substitutability between subject imports and domestic like product.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 11 of 30

Consol. Court No. 18-00013                                                      Page 11
**PUBLIC VERSION**

indicated that around two thirds of shipments of subject imports were within or substantially equivalent to HPVA grades. See Staff Report at Table IV-11. Neither AAHP nor Zhejiang have identified any evidence indicating that the questionnaire responses of market participants incorrectly identified subject merchandise as "substantially equivalent" to the relevant HPVA grade.[11] The ITC thus reasonably identified an overlap in grades of subject imports and domestic like product.[12]

The ITC then noted that, although there was little overlap in face veneer thickness,[13] the evidence was mixed as to the impact of this product characteristic on the substitutability of subject imports and domestic like product. See Views at 27. The ITC did not, as AAHP and Zhejiang argue, ignore evidence that HWPW with thin and thick face veneers have distinct uses, as thin face veneers are unsuitable for a sanded and stained finish. See AAHP's Br. at 8–9, Zhejiang's Br. at 13–15.[14] On the contrary, the

---

[11] Zhejiang also argues that it is not appropriate to compare subject imports and domestic like product on the basis of HPVA grade because HPVA grades have a minimum face veneer thickness requirement of 0.55 mm. See Zhejiang's Br. at 12. Zhejiang argues the minimum face veneer thickness requirement means HPVA grades are not applicable to subject imports, as 90% of subject imports have face veneers thinner than 0.55 mm. See id. Zhejiang's argument fails, however, as Zhejiang has not identified any reason that HWPW with thin face veneers could not be substantially equivalent to the relevant HPVA grade, as reported by market participants, even if the face veneer thickness of subject imports is thinner than 0.55 mm.

[12] AAHP further argues that an overlap in grade does not indicate that subject merchandise and domestic like product are used for the same applications, as grade is a "function of the appearance" and merely relates to "color and outward lack of visual defects." See AAHP's Reply at 14. However, grade is a reasonable point of comparison, as it affects the suitability of HWPW for exterior uses where appearance is a primary consideration. See Views at 10–11.

[13] In 2016, 93.9% of subject imports had a face veneer thinner than 0.4 mm while only [[   ]]% of domestic like product did. See Staff Report at Table III-7 & Table IV-7.

[14] AAHP specifically noted that the record evidence shows thin face veneers cannot be mechanically sanded. See AAHP's Br. at 8–9. AAHP also noted evidence that products were explicitly marketed on the basis of a thick face veneer. See id. at 8–10. Zhejiang argued that "[p]lywood with thin face veneers is typically not suitable for applications that require sanding and is not generally used for the exterior faces of cabinets which are sanded and stained." Zhejiang's Br. at 13–14.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 12 of 30

Consol. Court No. 18-00013                                                                    Page 12
PUBLIC VERSION

ITC noted record evidence indicating that thick face veneers were more desirable where the product is to be sanded and stained.  See Views at 27–28 & n.107.  This evidence, however, was contrasted by the ITC with questionnaire responses indicating that thick and thin face veneers were at least sometimes interchangeable.[15]  See id.  The ITC also noted that face veneer thickness was less significant for painted applications.  See id. Additionally, the ITC noted that face veneer thickness did not limit use of HWPW for interior cabinetry.  Id. at 27–28.  The ITC thus reasonably weighed the competing evidence and concluded that the evidence was mixed regarding the impact of face veneer thickness on the substitutability of subject imports and domestic like product.[16]

Finally, the ITC found market participants had "expressed disparate views" as to the degree of interchangeability between subject imports and domestic like product. Views at 24.  The ITC identified that a majority of importers identified subject merchandise as "always, frequently or sometimes" interchangeable, but that an equal number of importers (24 each) had reported the products sometimes or never interchangeable.  Id. at 24–25 & n.90.  Despite AAHP's and Zhejiang's arguments to the contrary, see

---

[15] The ITC stated that "a majority of responding purchasers reported that hardwood plywood with face veneers thinner than 0.5 mm and hardwood plywood with face veneers thicker than 0.5 mm were at least sometimes interchangeable in front and side cabinetry applications."  Views at 27; see also Staff Report at Table II-15.

[16] Zhejiang also challenges the ITC's reliance on questionnaire responses identifying that thin and thick veneer faces were at least sometimes interchangeable on the basis that market participants were asked to identify whether HWPW with face veneers thinner than 0.5 mm were interchangeable with HWPW with face veneers thicker than 0.5 mm.  See Zhejiang's Br. at 15. Zhejiang argues the questionnaire responses do not establish subject imports and domestic like product are interchangeable because the face veneers of the majority of subject imports were less than 0.4 mm and no evidence specifically shows that HWPW with face veneers less than 0.4 mm is interchangeable with HWPW with face veneers greater than 0.5 mm.  Id.  Zhejiang's argument is speculative because it has not pointed to any evidence indicating that questionnaire responses as to the interchangeability of thin and thick face veneers would be impacted by Zhejiang's preferred comparison of face veneers of less than 0.4 mm with face veneers of more than 0.5 mm.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 13 of 30

Consol. Court No. 18-00013                                                    Page 13
PUBLIC VERSION

Zhejiang's Br. at 11; AAHP's Br. at 9, the ITC did not improperly conflate the responses

of market participants as to the interchangeability of subject imports and domestic like

product.  Rather, the ITC reasonably aggregated questionnaire responses "sometimes,

frequently and always" on the basis that all those responses indicate that subject imports

and domestic like product are, at least sometimes, interchangeable.  See Views at 24–

25.  The ITC's finding of moderate substitutability is thus supported by substantial

evidence because the evidence of overlap in market share and product characteristics of

subject imports and domestic like product, as well as the perception of interchangeability

by a majority of market participants, are such that a reasonable mind might accept as

adequate support for the ITC's finding.[17]

Nonetheless, AAHP argues that the ITC's determination is unsupported by

substantial evidence because it failed to consider Purchaser A's[18] questionnaire

response which indicates subject imports are not interchangeable with domestic like

---

[17] AAHP also argues the ITC ignored evidence that subject imports' thinner veneers and more numerous crossbands lead to "additional strength and stability contributing to the strength of the core" which makes subject merchandise "preferable for the internal, structural components of the cabinet."  AAHP's Br. at 17; see also id. at 7 (noting that subject imports are made with thinner veneers in a two-step process, while domestic like product are made with thicker veneers in a mechanized process).  "Crossbands" describes veneers stacked with their grain in alternating directions.  See Staff Report at I-20.  AAHP argues that the additional strength and stability of subject imports undermines the ITC's "conclusion that imported and domestic panels are fully interchangeable for the interior of the cabinet."  AAHP's Br. at 16.  AAHP's argument fails because the ITC did not find that subject imports and domestic like product are fully interchangeable for cabinet interiors, but rather that subject imports and domestic like product are "moderately substitutable."  See Views at 18.  In making this finding, the ITC did not address whether domestic like product's thinner veneers affected its suitability for interior cabinetry; it simply noted record evidence that market participants had not identified face veneer thickness as limiting the use of HWPW for interior cabinetry applications.  See id. at 27–28.  AAHP's argument does not render the ITC's finding of "moderate substitutability" unreasonable as AAHP points to no evidence which indicates that the domestic like product cannot be used for the interiors of cabinets.

[18] Purchaser A refers to [[                                          ]].

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 14 of 30

Consol. Court No. 18-00013                                              Page 14
**PUBLIC VERSION**

product.[19]  See Reply Br. in Supp. Rule 56.2 Mot. J. Agency R. of [AAHP] at 14, Feb. 5, 2019, ECF No. 104 at 3–4 ("AAHP's Reply") (citing Purchaser A's Purchasing Questionnaire at 32, CD 430 (Aug. 10, 2017) ("Purchaser A's QR Resp.")).  Purchaser A's comments were not expressly discussed in the ITC's analysis of substitutability.  See Views at 24–28.  However, the ITC's determination may be sustained, if the path of the agency's decision is reasonably discernable.  See NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009).  The ITC discussed the disparate views of purchasers, including the views of "most importers and purchasers that subject and domestic [HWPW] can always, frequently, or sometimes be used interchangeably." Views at 24–25; see also id. at n.90.  From this discussion, it is reasonably discernible that the ITC concluded there was evidence in the record for and against the interchangeability of subject imports and domestic like product, and despite Purchaser A's response the ITC found subject imports and domestic like product to be interchangeable.  See Views at 24–25.[20]

―――――――――――――――

[19] Purchaser A's questionnaire states:

    [[



                                                                        ]]

    . . .
    [[
            ]]

Purchaser A's QR Resp. at 32.

[20] AAHP argues further that the ITC failed to consider the impact of core type differences in the lamination market.  See AAHP's Br. at 18.  However, the Staff Report identifies that no domestic like product used in cabinetry applications in 2016 was laminated.  See Staff Report at Table II-4.  Although lamination is common in the recreational vehicle/mobile home market, that market accounts for less than 3% of domestic like product end uses.  See Staff Report at Table III-12. AAHP's argument thus fails as it is reasonably discernible that the ITC did not consider lamination

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 15 of 30

Consol. Court No. 18-00013                                          Page 15
PUBLIC VERSION

Zhejiang argues that "[e]ven if the Commission's characterization of the level of substitutability as 'moderate' is reasonable, the Commission never defines this term or makes any effort to quantify the actual level of competition between subject imports and the domestic like product."   Zhejiang's Br. at 16.   The ITC found there to be many overlapping product characteristics and substantial overlapping market share between subject imports and domestic like product.   See Views at 24–28.   The ITC also found certain distinctions in product characteristics and some responses by market participants indicating that the products are not interchangeable.   See id.   The ITC's description of the level of substitutability as moderate reasonably captures the degree of substitutability demonstrated by the record evidence.   Findings of moderate substitutability and other findings of similar generality have been previously upheld by this court.   See, e.g., Altx, Inc. v. United States, 26 CIT 709, 712–15 (2002) (sustaining a finding that there was "at least a moderate level of substitutability" while remanding on other grounds); United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC v. United States, __ CIT __, __, 348 F. Supp. 3d 1328, 1333–35 (2018) (sustaining a finding of a "moderate-to-high" degree of substitutability while remanding on other grounds); ITG Voma Corp. v. U.S. Int'l Trade Comm'n, __ CIT __, __, 253 F. Supp. 3d 1339, 1351–57 (2017) (sustaining the ITC's

_____

or the recreational vehicle/mobile home market in its analysis of substitutability because it found there was no significant overlap between subject imports and domestic like product in those areas.

(footnote continued)

AAHP also contends that the ITC failed to consider the underlayment market segment. See AAHP's Br. at 17.  However, the ITC found that "domestic industry had only a small presence" in underlayment.  See Views at 26.  AAHP's argument in relation to underlayment thus also fails as it is reasonably discernible that the ITC did not consider the underlayment market segment in its analysis of substitutability because it found there was no significant overlap between subject imports and domestic like product in that market segment.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 16 of 30

Consol. Court No. 18-00013                                                Page 16
**PUBLIC VERSION**

finding of a "moderate to high" degree of substitutability).  Consequently, the court

sustains the ITC's finding of moderate substitutability in its analysis of the conditions of

competition in the HWPW market as supported by substantial evidence.

### III. Volume

AAHP and Zhejiang challenge as not in accordance with law and unsupported by

substantial evidence the ITC's determination that the subject import's volume and market

share grew at the expense of the domestic like product.  See AAHP's Br. at 25–37;

Zhejiang's Br. at 16–18; see also Views at 28–30.  Specifically, AAHP contends that the

ITC failed to consider data on consumer preferences and changing fashion trends

disclosed in purchaser questionnaire responses.  AAHP's Br. at 25–37.  Zhejiang

contends that the ITC failed to properly consider the different applications of domestic like

product versus subject imports in the manufacture of cabinets.  See Zhejiang's Br. at 16–

18.  Although AAHP and Zhejiang invoke different grounds for challenging the ITC's

volume determination, each of the grounds invoked rest on the assumption that the ITC

wrongfully applied its moderate substitutability finding and ignored the "attenuated" nature

of the competition between domestic like product and subject imports when conducting

its volume analysis.  Defendant responds that the ITC's volume determination was

supported by substantial evidence.  See Def.'s Resp. Br. at 25–32.  For the following

reasons, the ITC's volume determination is in accordance with law and is supported by

substantial evidence.

The ITC found that between 2014 and 2016, subject imports' market share

increased from 37.9% to 40.1%, while the domestic industry's decreased from 21% to

17.3%.  Views at 29 (citing Table IV-14).  Its analysis also took a nuanced looked at

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 17 of 30

Consol. Court No. 18-00013                                                    Page 17
**PUBLIC VERSION**

volume and market share trends associated with underlayment and within end-uses where the domestic industry was a substantial participant.[21]   Specifically, the ITC explained that after excluding volumes associated with shipments of underlayment, a category in which the domestic industry had a small presence, id. at 26 (citing Tables III-12, IV-12), it found that subject import volume rose steadily from "[[          ]] square feet in 2014 to [[          ]] square feet in 2015 and then to [[          ]] square feet in 2016[,]" and gained [[          ]] percentage points in market share between 2014 and 2016. Id. at 29–30.   By contrast, the domestic industry's market share declined by [[          ]] percentage points in the same time period.   Id. at 30.   The ITC further examined the domestic like product's performance within the cabinetry end-segment, its largest end-use, and found that, during the same period, market share decreased by 5.1%, while subject import volume steadily increased from 244.1 million square feet to 301.0 million square feet, id. (citing Table IV-12), and increased its market share by 6.9%.   Id. (citing Tables III-12, IV-12, IV-14).   Finally, the ITC found that the ratio of subject imports to U.S. production increased from 168% in 2014 to 223.8% in 2016.   Views at 29.   The material injury analysis requires the ITC to assess "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."   19 U.S.C. § 1677(7)(C)(i). Given the record evidence before the ITC, it was reasonable for it to conclude that the

---

[21] To the extent that AAHP and Zhejiang challenge the ITC's findings on volume as not in accordance with law because the ITC failed to analyze record evidence through the lens of moderate substitutability or attenuation of competition, AAHP's Br. at 26, [Zhejiang's] Reply Br. at 9–11, Feb. 5, 2019, ECF No. 103, the challenge fails.   In line with its moderate substitutability finding, when analyzing volume trends, the ITC excluded volumes of underlayment, an end-use category in which the domestic industry had a small presence, and reviewed changes in cabinetry, an end-use category in which the domestic industry had a significant presence.   See Views at 29–30.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 18 of 30

Consol. Court No. 18-00013                                             Page 18
PUBLIC VERSION

volume of the subject imports, both relative to apparent domestic consumption and in absolute terms, grew significantly during the period of investigation, and its determination is supported by substantial evidence and is in accordance with law.

Evidence regarding the degree of interchangeability of subject imports and the domestic like product and changing consumer trends provided by Purchaser A, see AAHP's Br. at 27–28, does not detract from the ITC's volume determination.   As discussed above, it is reasonably discernable that the ITC considered, but found unpersuasive, Purchaser A's attribution of increased demand for subject imports to shifts in consumer preferences and not interchangeability of the subject imports and domestic like product.  See generally Purchaser A's QR Resp. at 32.  The ITC acknowledged that some market participants found subject imports and domestic like product to never be interchangeable but explained that a majority of U.S. purchasers and most importers indicated a degree of substitutability.  See Views at 25 n.90, 25–28; see generally Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987). Further, Purchaser A was only one of over 30 responding U.S. purchasers.  Staff Report at II-2.

AAHP's and Zhejiang's remaining arguments presume that differences in physical characteristics of domestic like product and subject imports, all of which go to substitutability, were ignored by the ITC in its volume analysis and resulted in the ITC misreading the relevant data.  See AAHP's Br. at 25 (identifying the ITC's "[f]lawed [d]etermination [r]egarding [c]onditions of [c]ompetition" as the basis for its challenge to the volume analysis), 26 (contending that the determination "does not account for the attenuation of competition or the lack of substitutability proven by the record evidence[]"

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 19 of 30

Consol. Court No. 18-00013                                                      Page 19
**PUBLIC VERSION**

and that "the Commission's volume analysis is based on a fundamental misconception of the plywood market."), 27 (arguing that subject imports' physical characteristics made them "better suited" to satisfy increased demand than domestic like product), 27–31 (arguing that because domestic like product and subject imports satisfy specific and separate uses, e.g., the former for sanded and stained application and of thicker face-veneer, and the latter for painted application and of thinner face-veneer, and consumer preferences have shifted to painted cabinetry with thinner face-veneers, the volume analysis had to account for such nuance in the competition but failed to do so), 32–37 (arguing that increased demand cannot be distributed equally because domestic like product is used for cabinetry exteriors and subject imports for cabinetry interiors, which necessarily cover a larger surface area,[22] and that the domestic like product is not used for laminated purposes); Zhejiang's Br. at 16–18 (arguing that the volume analysis is unsupported by substantial evidence because the ITC failed to recognize the attenuated nature of competition within the cabinetry end segment, specifically focusing on interior versus exterior application and painted versus sanded and stained end-uses).  AAHP's and Zhejiang's challenges to the ITC's treatment of competition between subject imports and domestic products in the volume analysis are unpersuasive.  As discussed above, the ITC considered the differences in physical characteristics of domestic like product and subject imports when it examined substitutability.  The ITC acknowledged the disparate

---

[22] The ITC addressed the exterior versus interior application challenge by identifying record evidence showing that a significant percentage of subject imports are used for exterior applications, a substantial percentage of domestic product can in fact be painted, and that a substantial percentage of subject imports can be sanded.  See Views at 26–27 & n.101; Staff Report at Table II-3 (showing the share of purchases of subject imports for interior applications and exterior as [[       ]] and [[       ]], respectively).

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 20 of 30

Consol. Court No. 18-00013                                                    Page 20
**PUBLIC VERSION**

views of various market participants and reached a reasonable conclusion based upon the record evidence.  Views at 24–28.  The court will not reweigh the evidence.

The ITC likewise addressed whether out-of-scope merchandise, like medium density fiberboard, had a depressing effect on volumes of domestic like product.  <u>See</u> Views at 32–33 n.132, 38; AAHP's Br. at 29–31 (arguing that domestic actors turned to such out-of-scope merchandise to satisfy demand for painted cabinetry and away from domestic like product).  The ITC specifically noted that 65.1% of domestic producers' shipments in 2016 were of product with maple or birch veneer that can be used for painted application and that during the period of investigation non-subject imports constituted less than 6% of U.S. shipments for cabinetry end-use.  Views at 26, 38–39.  Given the record evidence, the ITC's determination that out-of-scope merchandise was in limited competition with either domestic like product or subject imports was not unreasonable.  Accordingly, the ITC's findings provide substantial evidence to support its conclusion that subject imports' volume grew, both in absolute terms and relative to production and consumption.

## IV. Price-Effects

AAHP and Zhejiang challenge as not in accordance with law and unsupported by substantial evidence the ITC's determination that during the period of investigation subject imports significantly undersold domestic like product and that such underselling "prevented price increases, which otherwise would have occurred, to a significant degree."  <u>See</u> AAHP's Br. at 19–25; Zhejiang's Br. at 18–23; Views at 34.  AAHP and Zhejiang again invoke arguments grounded in the presumption that domestic like product and subject imports are not substitutable and that the market is more "attenuated" than

the ITC gave credence to in its analysis.  See AAHP's Br. at 19–25; Zhejiang's Br. at 18–

23.  AAHP also argues that the ITC failed to consider the effect of non-subject imports on

price.  See AAHP's Br. at 24.  Defendant responds that the ITC's determination was

supported by substantial evidence.  See Def.'s Resp. Br. at 32–41.  For the following

reasons, the ITC's pricing analysis is supported by substantial evidence.

The material injury analysis requires the ITC to determine the effects of subject

imports on U.S. prices of the domestic like products, which it does by examining whether

(1) there has been "significant price underselling by the imported merchandise as

compared with the price of domestic like products" and (2) "the effect of imports of such

merchandise otherwise depresses prices to a significant degree or prevents price

increases, which otherwise would have occurred, to a significant degree."  19 U.S.C. §

1677(7)(C)(ii)(I)–(II).

As to underselling, the ITC identified record evidence that domestic like product

was undersold by subject imports in all 84 quarterly price comparisons and identified lost

sales revenue.  Views at 31–33.  The ITC also noted that of the 23 responding purchasers

that reported buying subject imports rather than domestic like product, 13 identified price

as the primary reason for the purchasing decision and 22 indicated that the subject

merchandise was lower in price.  Id. at 32 (citing Staff Report at V-24).[23]  The ITC further

---

[23] AAHP argues that the ITC's lost revenue finding is unreasonable because, based on volume, the 13 purchasers that invoked price as the primary reason for switching from domestic like product to subject imports represent only [[     ]]% of all purchases reported during the period of investigation.  AAHP's Br at 24–25; AAHP's Reply Br. at 25–26.  Defendant and Defendant-Intervenor contest AAHP's interpretation of the lost sales and revenue data to arrive at the [[     ]]% figure.  See Def.'s Resp. Br. at 39; Resp. Br. Def.-Intervenor [Coalition] at 25 Jan. 9, 2019, ECF No. 97.  Notwithstanding the parties' disagreement on how the percentage figure was calculated, AAHP's argument is a request that the court reweigh the evidence.  The ITC reviewed pricing data that was on the record before it and its determination is not unreasonable.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 22 of 30

Consol. Court No. 18-00013                                                    Page 22
**PUBLIC VERSION**

found that increase in the domestic industry's cost of goods sold should have resulted in

some price increase, but did not.  Id. at 32–33.  The ITC explained that given the high

margins of underselling, the important role price plays in purchasing decisions, the

increase in the volume of subject imports in segments of the plywood market where

domestic like products participate substantially, and relatively flat prices of domestic

product in a period where both demand and costs for raw materials and for goods sold

increased, it determined that subject imports had a "restraining" effect on the prices of the

domestic like product.[24]  Views at 32–34.[25]  Finally, the ITC addressed the effect of non-

subject imports, explaining that because face-veneer species is important to purchasers

and a "relatively little" number of subject imports and domestic like product have the

tropical face veneer that the majority of non-subject imports have, any overlap is limited.

Views at 38–39 (showing that domestic like product and subject imports are commonly of

[[      ]] or [[        ]] face veneer); Staff Report at Table III-11, Table IV-11.  The court

---

[24] AAHP argues that the pricing data can be explained by the "broad retreat in demand" for "[[
                                              ]]."  AAHP's Reply Br. at 26–27 (citations omitted).  The
argument presumes lack of substitutability, asks the court to reweigh the evidence, and is
unpersuasive given the court's findings on substitutability.  AAHP also contends that the "modest"
increases in the cost of goods sold and raw materials costs, amounting to $0.02 and $0.01
respectively, do not demonstrate that subject imports affected the prices of the domestic like
product.  Id.; see also Views at 33–34.  The ITC, however, explicitly recognizes that the increases
were modest, Views at 32, and uses the evidence of increase to find that a modest increase in
the domestic like product should have occurred.  The ITC's determination is not unreasonable on
this record.

[25] Both AAHP and Zhejiang contend that the ITC's price effects determination is not in accordance
with law because the ITC failed to delineate the causal link between underselling and price
suppression as required by 19 U.S.C. § 1677(7)(C)(ii).  See AAHP's Reply Br. at 24–25,
Zhejiang's Reply Br. at 12–13.  The parties' challenges rest on the assumption that the lower
priced subject imports could not have had an effect on the domestic like product because the
products are not substitutable and therefore do not compete.  As the court explained, the ITC's
substitutability determination is supported by substantial evidence and its conclusion that subject
imports had a restraining effect on prices of the domestic like product is reasonable on this record.
Accordingly, AAHP's and Zhejiang's not in accordance with law challenges are unpersuasive.

addresses the impact of non-subject imports in greater detail below and here incorporates

its reasoning for why such imports cannot account for the price effects the ITC attributed

to subject imports.   Given the record evidence before it, the ITC's conclusions as to

underselling and price suppression is supported by substantial evidence and is in

accordance with law.

AAHP's challenges assume that the ITC's substitutability finding is unsupported by

substantial evidence and simply provide an alternate reading of the pricing data.

Specifically, where the ITC concludes that evidence of stability in the average unit value

of the domestic industry's net sales indicates that subject imports "restrain[ed]" the prices

of the domestic like product, <u>see</u> Views at 32–34, AAHP contends that evidence

demonstrates that subject imports and domestic like product "co-exist in the marketplace

without any pricing effect on one another," because otherwise the prices would have

converged.   AAHP's Br. at 21.[26]   The court will not reweigh the evidence.

Zhejiang contends that physical differences between domestic like product and

subject imports, which were not accounted for in the six pricing products, limit the pricing

data's relevance and usefulness because the grades specified are "inapplicable" and

forced importers "to subjectively determine 'substantially equivalent' grades without any

objective parameters" and did not specify face veneer thickness.   <u>See</u> Zhejiang's Br. at

---

[26] AAHP also attempts to reargue its substitutability challenge by claiming that the pricing data
demonstrates that the market dynamics are more attenuated by end-use than the ITC gave
credence to and that purchasers like Purchaser A, [[                              ]], and [[
                                             ]] distinctly recognize that price is not the
distinguishing factor in product selection.   AAHP's Br. at 21–22, 24–25.   It is reasonably
discernable that the ITC did not find AAHP's arguments persuasive given that there is also
evidence on the record that [[

                                                                      ]], Staff
Report at Table V-12, and that Purchaser A is but one of over 30 responding U.S. purchasers.
<u>See</u> Staff Report at II-2.

18–23; [Zhejiang's] Reply Br. at 11–12, Feb. 5, 2019, ECF No. 103 ("Zhejiang's Reply

Br.").[27]   The challenge fails as it presumes that face-veneer thickness and grades, both

physical indicators, demonstrate that domestic like product and subject imports are not

substitutable.   The court incorporates its reasoning sustaining the ITC's substitutability

analysis here as basis for why Zhejiang's challenges to the ITC's treatment of competition

between subject imports and domestic products in the pricing analysis are

unpersuasive.[28]   The ITC's findings provide substantial evidence to support its conclusion

that subject imports significantly undersold domestic like product and suppressed its

price.

## V.  Impact

AAHP argues that the ITC's finding that subject imports had a significant impact

on the domestic industry is unsupported by substantial evidence because it relies on an

unreasonable finding of moderate substitutability between subject imports and domestic

---

[27] Zhejiang did not object to the pricing definitions proposed by the ITC in its draft questionnaires and has therefore failed to exhaust its challenge to the inapplicability of the six pricing products to the merchandise at issue.   See 28 U.S.C. § 2637(d) (2012) (requiring that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies"); 19 C.F.R. § 351.309(c)(2) (2017) (requiring that a party's administrative case brief "present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination").   To the extent that Zhejiang's challenge is to how the ITC interpreted the data and the nature of competition, the challenge fails as it again rests on the assumption that the ITC wrongly determined that the domestic like product and the subject imports are substitutable.

[28] Zhejiang also invokes the ITC's negative injury determination in Plywood I to argue that here, the ITC acted in an arbitrary and capricious manner because it interpreted the same data as was previously before it and reached an opposite conclusion.   See Zhejiang's Reply Br. at 2–4 (arguing that the principle of sui generis, which isolates determinations to their individual records, assumes that the facts and circumstances of each investigation are unique, which is not the case here); see also Hardwood Plywood from China, USITC Pub. 4434, Inv. Nos. 701-TA-490 and 731-TA-1204 (Final) (Nov. 2013) (Plywood I).   It further argues that given the consistency of record evidence here and in Plywood I, the ITC's determination is not supported by substantial evidence.   See, e.g., Zhejiang's Br. at 10–14, 18–19, 22–23.   The records of the two proceedings are not identical and the record of each determination stands on its own.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 25 of 30

Consol. Court No. 18-00013                                                    Page 25
**PUBLIC VERSION**

like product.  <u>See</u> AAHP's Br. at 38.  Zhejiang argues the ITC's impact finding is unsupported by substantial evidence because it depends on findings regarding volume and price effects which Zhejiang considers unsupported by substantial evidence.  <u>See</u> Zhejiang's Br. at 23.  Defendant responds that the ITC's impact analysis was supported by substantial evidence.  <u>See</u> Def.'s Resp. Br. at 41–49.  For the reasons that follow, the ITC's impact analysis was supported by substantial evidence.

       To determine whether material injury exists, the ITC must consider the impact of subject imports on domestic producers of domestic like products in the context of production operations within the United States. 19 U.S.C. § 1677(7)(B)(i)(III).  When assessing the impact of subject imports, the ITC "shall evaluate all relevant economic factors which have a bearing on the state of the industry."  19 U.S.C. § 1677(7)(C)(iii).  In this case, the ITC found that domestic industry's production, capacity utilization, end-of-period inventories, shipments, and market share all declined.  <u>See</u> Views at 35–36.  Although employment trends were mixed, the ITC found that domestic industry's net sales revenues, cost of goods sold, selling, general and administrative expenses, ratio of operating income to net sales, gross profit, operating income and net income all declined.  <u>See</u> <u>id.</u> at 36–37.  The ITC found that these economic factors declined as a result of the significant and increased volumes of subject imports that significantly undersold the domestic like product.  <u>See</u> <u>id.</u> at 37.  The deteriorating economic indicators, combined with the finding that there had been a significant increase in the volume of subject imports that undersold domestic like product, provided a reasonable basis for the ITC to conclude that subject imports had a significant impact on domestic industry.

AAHP's and Zhejiang's challenges to the ITC's impact analysis again presume that the ITC's substitutability, volume, and price effects analyses are unreasonable and unsupported by substantial evidence.  See AAHP's Br. at 38; Zhejiang's Br. at 23.  As discussed above, however, the ITC's finding that there is a moderate degree of substitutability between subject imports and domestic like product is supported by substantial evidence, as are its findings on volume and price effects.  Consequently, the ITC's impact analysis is supported by substantial evidence.

## VI. Causation

AAHP and Zhejiang argue that the ITC's affirmative injury determination is unsupported by substantial evidence because the ITC unreasonably concluded that non-subject imports could not account for the magnitude of the price effects or domestic industry's loss of market share during the period of investigation.  See AAHP's Br. at 37–44; Zhejiang's Br. at 23–26.  Zhejiang further argues that the ITC's finding was arbitrary and capricious.  See Zhejiang's Br. at 23–26.  Defendant responds that the ITC's analysis of non-subject imports was supported by substantial evidence and not arbitrary and capricious.  See Def.'s Resp. Br. at 41–49.  For the following reasons, the ITC's determination regarding non-subject imports is supported by substantial evidence and not arbitrary and capricious.

The ITC must identify that the material injury to the domestic industry was "by reason of" subject imports.  See 19 U.S.C. § 1677(7)(B)(ii).  The term "by reason of" is not defined but has been held by the Court of Appeals of the Federal Circuit to require that the subject imports be more than a "merely incidental, tangential, or trivial'' cause of the material injury suffered by domestic industry.  See Nippon Steel Corp. v. United

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 27 of 30

Consol. Court No. 18-00013                                                    Page 27
**PUBLIC VERSION**

States, 458 F.3d 1345, 1357 (Fed. Cir. 2006).  Subject imports need not, however, be the

principal cause of injury.  See Nippon Steel Corp. v. United States, 345 F.3d 1379, 1381

(Fed. Cir. 2003).  In finding material injury is "by reason of" subject imports, the ITC will

examine factors other than subject imports to ensure that it is not attributing injury from

other factors to the subject imports.  See Views at 17–18; see also Uruguay Round

Agreements Act, Statement of Administrative Action, H.R. Rep. 103-316, vol. I at 851–52

(1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4184–85.

Non-subject imports' market share increased from 41.1% in 2014 to 42.6% in 2016

and were the largest source of supply over the period of investigation.  See Views at 24.

The ITC acknowledged that non-subject imports were sold at a lower average unit value

than domestic like product throughout the period of investigation.  See id. at 38.  The ITC,

however, found that there was limited competition between non-subject imports as

against domestic like product and subject imports, because non-subject imports were

predominantly sold with face veneers of tropical species,[29] and were more concentrated

in very thin plywood.[30]  See id.  The ITC also observed that non-subject imports were

predominantly sold for recreational vehicle/mobile home use.  See id.[31]  Finally, the ITC

noted that only 6% of non-subject imports were used for cabinetry, the domestic industry's

largest end-use.  See id.  Given the record evidence before it, the ITC's findings that the

[29] HWPW with face veneers of tropical wood accounted for 81.3% of non-subject imports, but only 13.0% of subject imports and [[     ]]% of domestic shipments.  See Staff Report at Table III-11 & Table IV-11.

[30] In 2016, 81.8% of non-subject imports had an overall thickness of less than 6.5 mm, as compared to 55.0% of subject imports and 22.6% of domestic like product.  See Staff Report at Table III-8 & Table IV-8.

[31] In 2016, 62.6% of non-subject imports were sold for recreational vehicles/mobile homes, compared to 6.3% of subject imports and 2.9% of domestic like product.  See Table III-12 & Table IV-12.

Case 1:18-cv-00013-CRK   Document 147   Filed 06/27/19   Page 28 of 30

Consol. Court No. 18-00013                                              Page 28
**PUBLIC VERSION**

competition between non-subject imports on the one hand and subject imports and domestic like product on the other, was limited, and that "non-subject imports cannot explain the magnitude of the domestic industry's loss of market share or the price effects we have attributed to subject imports[,]" id. at 38–39, was reasonable and supported by substantial evidence.

AAHP argues that the ITC failed to consider a range of record evidence that detracts from its causation finding.  See AAHP's Br. at 39–44.[32]  AAHP's argument fails, however, as AAHP in substance simply asks the court to reweigh the evidence.  As noted above, the ITC's determination may be sustained if the path of the agency's decision is reasonably discernable.  See NMB Singapore, 557 F.3d at 1319–20.  It is reasonably discernible that the ITC, looking at the record as a whole, concluded that non-subject imports' predominantly tropical face veneers and overall thinness were in limited competition with both the domestic like product and subject imports.  See Views at 38–39.  This conclusion is supported by the fact that non-subject imports are predominantly used for recreational vehicles/mobile homes, where other HWPW products do not compete.  See id.  It is also supported by the fact that non-subject imports have only a small presence in cabinetry, which is the main area of competition between domestic like product and subject imports.  See id.  AAHP has not cited any evidence which renders

---

[32] AAHP points to evidence such as to the degree of competition between HWPW with tropical and non-tropical face veneers, the potential impact of the volumes of non-subject imports with non-tropical face veneers, the significance of overall plywood thickness, and the volume of non-subject imports used in cabinetry.  See AAHP's Br. at 39–44.

these factual findings unsupported by substantial evidence.  AAHP's argument thus fails as it simply constitutes a request that the court reweigh the evidence.[33]

The ITC's finding that non-subject imports have limited competition with other products and thus cannot explain the material injury suffered by domestic industry is also not arbitrary or capricious.  Zhejiang argues the ITC "arbitrarily dismissed non-subject imports as a cause of material injury based on differences in physical characteristics and end-uses, while finding that subject importers were a cause of material injury despite differences in physical characteristics and end-uses."  See Zhejiang's Br. at 25–26. Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently.  See West Deptford Energy, LLC v. FERC, 766 F.3d 10, 21 (D.C. Cir. 2014).  The ITC's determination is not arbitrary or capricious because as discussed above it did not find that non-subject imports and subject imports differed from domestic like product in the same way, both in terms of physical characteristics and market impact.  The ITC did not act arbitrarily in treating subject imports and non-subject imports differently.  The court thus sustains the ITC's finding that non-subject imports cannot account for the magnitude of the price effects or impact on the domestic industry.

---

[33] AAHP again argues that the ITC improperly failed to consider Purchaser A's questionnaire response in analyzing competition between non-subject imports and other HWPW products.  See AAHP's Br. at 41–42.  However, the ITC is not required to explicitly address every questionnaire response provided by market participants as long as its reasoning is reasonably discernible.  See NMB Singapore, 557 F.3d at 1319–20.  It is reasonably discernible here that the ITC concluded that the weight of evidence indicated that the different product characteristics of non-subject imports limited competition with other HWPW products. Purchaser A's response is one of many and does not alone make unreasonable the ITC's overall assessment that competition was limited between non-subject imports and other HWPW products as a result of differing product characteristics and uses.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the ITC's final affirmative injury determination is sustained.

Judgment will enter accordingly.

   _/s/ Claire R. Kelly_
Claire R. Kelly, Judge


Dated: June 19, 2019
New York, New York